IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

PATRICIA ANCHONDO,

       Plaintiff,

v.                                             CIV 15-0893 KBM

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

       Defendant.

## MEMORANDUM OPINION AND ORDER

THIS MATTER comes before the Court on Plaintiff's Motion to Reverse and Remand for Rehearing with Supporting Memorandum (*Doc. 18*), filed June 20, 2016. Pursuant to 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73(b), the parties have consented to me serving as the presiding judge and entering final judgment. *Doc. 9.* Having reviewed the parties' submissions, the relevant law, and the relevant portions of the Administrative Record, the Court will deny the Motion.

**I.    Procedural History**

Plaintiff protectively filed applications with the Social Security Administration for disability insurance benefits and supplemental security income under Titles II and XVI of the Social Security Act on August 11, 2011. *AR* at 81-84, 177-89.[1] Plaintiff alleged a disability onset date of December 21, 2008, due to "back pain; arthritis on right leg; sleep apnea; breathing problems; high cholesterol; high blood pressure; acid reflux disease; [and] thyroid problems." *AR* at 85. Prior to claiming disability, Plaintiff worked

---

[1] Documents 13-1 through 13-14 comprise the sealed Administrative Record ("*AR*"). The Court cites the Record's internal pagination, rather than the CM/ECF document number and page.

as a cashier at a gas station, a laundry attendant, a cashier at a grocery store, a cashier checker at a Family Dollar,[2] and again as a laundry attendant. *AR* at 68-73. Plaintiff testified that she stopped working at this final position because she could not walk anymore or do any lifting due to back pain. *AR* at 50-51.

The agency denied Plaintiff's claims initially and upon reconsideration, and she requested a hearing. *AR* at 81-108, 132-33. After a *de novo* hearing, Administrative Law Judge Myriam C. Fernandez Rice ("the ALJ")[3] issued an unfavorable decision on March 28, 2014. *AR* at 20-36. Plaintiff submitted a Request for Review of the ALJ's Decision to the Appeals Council, which the Council declined on August 11, 2015. *AR* at 1-13, 15-16. As such, the ALJ's decision became the final decision of the Commissioner. *Doyal v. Barnhart*, 331 F.3d 758, 759 (10th Cir. 2003). This Court has jurisdiction to review the decision pursuant to 42 U.S.C. § 405(g) and 20 C.F.R. § 422.210(a).

A claimant seeking disability benefits must establish that she is unable to engage in "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); 42 U.S.C. § 1382c(a)(3)(A); 20 C.F.R. §§ 404.1505(a), 416.905(a). The Commissioner must use a five-step sequential evaluation process to determine eligibility for benefits. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *see Wall v. Astrue*, 561 F.3d 1048, 1052 (10th Cir. 2009).

---

[2] Plaintiff was actually an assistant manager in title at Family Dollar. Because she did not hire or fire and did not handle employee scheduling, however, the Vocational Expert (Judith Beard) testified that the job would more closely resemble that of a cashier checker. *AR* at 71-73.

[3] Although Plaintiff's Motion repeatedly refers to ALJ Farris, it is later clear from the record and Reply Brief that ALJ Fernandez Rice presided.

At Step One of the process, the ALJ found that Plaintiff had not engaged in substantial gainful activity during the relevant time period. *AR* at 23. At Step Two, she determined that Plaintiff had the severe impairments of "obesity, obstructive sleep apnea, chronic right knee (sic), low back and right hip pain, myofascial pain syndrome, hypertension, hypothyroidism, chronic obstructive pulmonary disease, urinary incontinence, and depression. . . ." *AR* at 23. At Step Three, the ALJ concluded that Plaintiff's impairments, individually and in combination, did not meet or medically equal the regulatory "listings." *AR* at 24-25.

When a claimant does not meet a listed impairment, the ALJ must determine the claimant's residual functional capacity ("RFC"). 20 C.F.R. §§ 404.1520(e), 416.920(a)(4). RFC is a multidimensional description of the work-related abilities a plaintiff retains in spite of her medical impairments. 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). In this case, the ALJ determined that Plaintiff retained the RFC to

> perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except that she can never climb ladders, ropes or scaffolds; can occasionally climb ramps and/or stairs; can occasionally stoop, crouch, kneel and crawl; is limited to jobs which can be performed while using a hand held assistive device required for prolonged ambulation; should avoid concentrated exposure to environmental irritants such as fumes, odors, dusts, and gases; should avoid concentrated exposure to chemicals; and can understand, carry out, and remember detailed but not complex instructions, make decisions, attend and concentrate for extended periods, accept instructions, and respond appropriately to changes in a routine work setting.

*AR* at 26. Employing this RFC at Steps Four and Five, the ALJ determined that Plaintiff was unable to perform her past relevant work. *AR* at 34. However, the ALJ found that there were jobs that exist in significant numbers in the national economy that Plaintiff can perform; specifically, the ALJ determined that Plaintiff maintains the RFC to work as

a food checker and check cashier. *AR* at 35. Accordingly, the ALJ determined that Plaintiff was not disabled from her alleged onset date through the date of her decision, and denied benefits. *AR* at 47.

## II.    Legal Standard

This Court "review[s] the Commissioner's decision to determine whether the factual findings are supported by substantial evidence and whether the correct legal standards were applied." *Vigil v. Colvin*, 805 F.3d 1199, 1201 (10th Cir. 2015) (quoting *Mays v. Colvin*, 739 F.3d 569, 571 (10th Cir. 2014)). A deficiency in either area is grounds for remand. *Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1161 (10th Cir. 2012).

## III.    Analysis

### A) Treatment of Dr. Vigil's Opinion

After reviewing the medical records, John R. Vigil, M.D., examined Plaintiff on December 20, 2013, at the request of her attorney. *AR* at 756. Dr. Vigil concluded that Plaintiff's "disabilities, including her chronic pain, fatigue, and COPD, severe depression and anxiety, as well as her severe physical deconditioning preclude her from performing even sedentary work on a full-time and sustained basis from at least 2012." *AR* at 763. The ALJ "accord[ed] little weight to Dr. Vigil's opinion regarding as to (sic) the nature and severity of [Plaintiff's] impairments and resulting limitations." *AR* at 33. In other words, the ALJ effectively rejected Dr. Vigil's opinion. *Chapo v. Astrue*, 682 F.3d 1285, 1291 (10th Cir. 2012) (equating "according little weight to" an opinion with "effectively rejecting" it); *Crowder v. Colvin*, 561 F. App'x 740, 742 (10th Cir. 2014) (unpublished) (citing *Chapo* for this proposition); *Ringgold v. Colvin*, 644 F. App'x 841, 844 (10th Cir. 2016) (unpublished) (same). Plaintiff argues that the ALJ erred in giving Dr. Vigil's

4

opinion little weight because "[t]he ALJ failed to supply adequate reasons for rejecting

Dr. Vigil's assessment." *Doc. 18* at 12.

Dr. Vigil's findings are considered an "examining medical-source opinion."

*Ringgold*, 644 F. App'x at 843 (citing *Chapo*, 682 F.3d at 1291; 20 C.F.R. §§

404.1527(c)(1), 416.927(c)(1)). "An examining medical-source opinion 'may be

dismissed or discounted, of course, but that must be based on an evaluation of all of the

factors set out in the . . . regulations and the ALJ must provide specific, legitimate

reasons for rejecting it.'" *Id.* The relevant factors include:

> (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (3) the degree to which the physician's opinion is supported by relevant evidence; (4) consistency between the opinion and the record as a whole; (5) whether or not the physician is a specialist in the area upon which an opinion is rendered; and (6) other factors brought to the ALJ's attention which tend to support or contradict the opinion.

*Id.* (citing *Watkins v. Barnhart*, 350 F.3d 1297, 1301 (10th Cir.2003); *Chapo*, 682 F.3d at

1291; 20 C.F.R. §§ 404.1527(c), 416.927(c)). "The ALJ is not required to mechanically

apply all of these factors in a given case. . . . It is sufficient if [s]he 'provide[s] good

reasons in [her] decision for the weight [s]he gave to the [physician's] opinions.'" *Id.*

(quoting *Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007)).

The ALJ gave the following reasons for giving Dr. Vigil's opinion little weight:

> [1] Dr. Vigil is not a treating physician and saw the claimant on only one occasion. [2] Although the claimant alleges that she became unable to work in December 2008, Dr. Vigil indicated that his limitations applied only as of 2012. [3] Many of the claimant's statements to Dr. Vigil are inconsistent with statements that she made to other providers, including claims that she could walk only 10 yards and did no housework. [4] All abnormalities noted by Dr. Vigil on his examination of the claimant can be within the claimant's voluntary control, including walking slowly, using a cane, declining to walk on toes or heels or to squat or hop, and limiting

motion of the spine. [5] Other physicians have observed the claimant to walk without a cane, walk on toes and heels, squat, hop, and move her lumbar spine fully. [6] Dr. Vigil did not report neurological deficits such as impaired reflexes, decreased sensation, or muscle weakness or atrophy. [7] The claimant told Dr. Vigil that she stopped working in 2009 due to "pain issues and her depression and anxiety issues" but five years of regular doctor visits show no ongoing complaints of depression or anxiety. [8] Dr. Vigil noted on examination that the claimant's affect and mood appeared normal although she did appear moderately anxious (Ex. 14F/6). This is scant evidence to support his opinion that the severity of the claimant's depression meets the requirements of section 12.04 of the listed impairments (Ex. l 7F). [9] Further, Dr. Vigil is not a psychiatrist.

*AR* at 33. The question is whether these reasons comport with the regulations and relevant case law.

The Court finds little fault with the ALJ's first reason. As noted above, the regulations explicitly permit an ALJ to discount an examiner's opinion on the basis of the length of and nature and extent of the treatment relationship. Here, Dr. Vigil saw Plaintiff only once. True, an ALJ may not disregard an examining source's opinion *solely* on the basis of this factor, *Chapo*, 682 F.3d at 1291, but this was not the only reason that the ALJ provided.

As to the ALJ's second reason, "Dr. Vigil's indicat[ion] that that his limitations only applied as of 2012," *AR* at 33, Plaintiff points out that "Dr. Vigil actually opined that the claimant was disabled 'from **at least** 2012." *Doc. 18* at 13 (emphasis in original) (citing *AR* at 763). The Court agrees that the ALJ failed to include "at least" in stating this reason. However, Plaintiff does not explain why this makes a difference. Plaintiff goes on to argue that "it is unclear how an onset date that is different from the claimant's alleged onset date could justify ALJ Fernandez Rice's total rejection of Dr. Vigil's opinion." *Doc. 18* at 14. The Court agrees in principle that if this was the ALJ's only reason for discounting Dr. Vigil's opinion, then she might have committed reversible

6

error.[4] Again, however, this was not the ALJ's only reason for discounting the opinion, and the ALJ could correctly consider it as an "other factor" which tends to detract from the opinion.

Plaintiff takes issue with the ALJ's third reason, related to her representations to Dr. Vigil that she could only walk 10 yards and did no housework, because the ALJ "conveniently fails to cite to any evidence of record regarding the allegation that Ms. Anchondo reported differently to other providers." *Doc. 18* at 14. It is true that the ALJ did not cite specific medical evidence at this point in the decision. However, elsewhere in the decision the ALJ notes that Plaintiff reported to her primary care provider that she walks "about a mile twice a week." *AR* at 28 (citing *AR* at 400). Likewise, elsewhere in the decision the ALJ references Plaintiff's function report in which she reported that that she "does housecleaning, laundry and meal preparation with her daughter's help." *AR* at 25 (citing *AR* at 252-255). Moreover, the Commissioner correctly notes that Plaintiff indeed reported doing housecleaning to other providers. *See, e.g.*, *AR* at 647. In sum, the Court finds that this reason comports with the ALJ's duty to consider the opinion in light of the record as a whole.

The Court agrees that the ALJ's fourth reason essentially accuses Plaintiff of malingering, but if it is compared with the ALJ's fifth reason, one can see why the ALJ reached that conclusion. As the ALJ notes, Plaintiff was able to walk on her heels and toes at different points in her medical treatment. *AR* at 27 (discussing claimant's appointment with Dr. Mladinich, *AR* at 479). Likewise, when she was examined by consultative examiner Harry Burger, D.O., Plaintiff "could walk on her heels, walk on her

---

[4] Plaintiff was only required to prove that her disability would last for a period of 12 months, 42 U.S.C. § 423(d)(1)(A), and Dr. Vigil examined her in December, 2013. *AR* at 756. Thus, even if she only became disabled in 2012, Plaintiff would still meet the statutory definition.

toes, squat, and do heel-to-toe walking." *AR* at 28; *see also AR* at 360. In contrast, when she was examined by Dr. Vigil, Plaintiff was unable to walk on toes or heels and was unable to squat or hop. *AR* at 762. Thus, the ALJ rightly pointed out an inconsistency between Dr. Vigil's findings and the record as a whole, one of the regulatory factors she was to consider.

Finally, Plaintiff complains that the ALJ wrongfully discredited the mental limitations assessed by Dr. Vigil. *Doc. 18* at 14. But every reason the ALJ gave for discounting Dr. Vigil's conclusions as to Plaintiff's mental limitations is consistent with the regulations and the record as a whole. For example, the ALJ noted that despite reporting to Dr. Vigil that they were part of the reason she was disabled, Plaintiff had no ongoing complaints of depression or anxiety. *See* 20 C.F.R. §§ 404.1527(c)(4), 416.927(c)(4) (consistency with the record). Likewise, the ALJ discounted the opinion on the basis of its internal inconsistency – noting that Plaintiff's affect and mood did not support Dr. Vigil's finding that her depression was severe enough to meet a listing. *See* 20 C.F.R. §§ 404.1527(c)(3), 416.927(c)(3) (supportability of the decision). Finally, the ALJ discounted Dr. Vigil's finding as to the severity of Plaintiff's mental limitations because he is not a psychiatrist. *See* 20 C.F.R. §§ 404.1527(c)(5), 416.927(c)(5) (specialization).

In sum, the Court finds that, on the whole, the ALJ gave adequate reasons for according Dr. Vigil's opinion little weight.

### B) Duty to Develop the Record

Plaintiff argues that the ALJ failed in her duty to develop the record by denying her counsel's requests that she be sent for a consultative examination to address the

effects of her "psychological and developmental learning impairments." *Doc. 18* at 2. The Court disagrees.

Plaintiff, through counsel, requested on three occasions "a consultative psychological evaluation with WAIS testing to ascertain the extent and severity of [her] depression, anxiety, and limitations." *AR* at 352. First, Plaintiff wrote a letter to the ALJ on December 20, 2013. *AR* at 352. Then, Plaintiff renewed her request for a consultative examination at her hearing before the ALJ. *AR* at 46. Finally, Plaintiff wrote the ALJ a second letter on January 28, 2014. *AR* at 355. In Plaintiff's letters, she refers to a third-party statement from her daughter detailing her inability to read and write, Dr. Vigil's findings that she suffers from anxiety, depression, and panic attacks, the fact that she was in special education, and her inability to graduate high school or pass the GED. *See AR* at 352, 355. Plaintiff's testimony at the hearing was consistent with her letters. *See AR* at 50, 60-64.

The ALJ denied Plaintiff's request in her written opinion. *AR* at 21. In so doing, the ALJ reasoned:

> This claimant has been seen by her primary care physicians on a regular basis, and all complaints have been thoroughly evaluated. She has been referred to specialists for evaluation of many complaints and has undergone numerous tests; notably, she did not complain of anxiety or depression until a few weeks before the hearing. Further, treatment notes show that she has discussed complicated medical issues, such as surveillance versus biopsy of pulmonary nodules, with her physicians with no indication of any limitation in understanding.

*AR* at 21. The question is whether the ALJ abused her discretion in denying Plaintiff's request for a consultative psychological evaluation.

While "[i]t is beyond dispute that the burden to prove disability in a social security case is on the claimant[,] . . . [n]evertheless, because a social security disability hearing

is a nonadversarial proceeding, the ALJ is 'responsible in every case to ensure that an adequate record is developed during the disability hearing consistent with the issues raised.'" *Madrid v. Barnhart*, 447 F.3d 788, 790 (10th Cir. 2006) (quoting *Hawkins v. Chater*, 113 F.3d 1162, 1164 (10th Cir. 1997)). The ALJ's "duty to develop the record pertains even if the claimant is represented by counsel." *Flaherty v. Astrue*, 515 F.3d 1067, 1071 (10th Cir. 2007) (quoting *Thompson v. Sullivan*, 987 F.2d 1482, 1492 (10th Cir. 1993)).

The Court begins with the proposition that the Commissioner "has broad latitude in ordering a consultative examination." *Diaz v. Sec'y of Health and Human Servs.*, 898 F.2d 774, 778 (10th Cir. 1990). The regulations permit an ALJ to order a consultative examination if the medical sources do not provide sufficient evidence about an impairment for the agency to determine whether a claimant is disabled. 20 C.F.R. §§ 404.1517, 416.917. Before purchasing a consultative examination, the agency considers existing medical reports, the disability interview form, and any other pertinent information in the record. 20 C.F.R. §§ 404.1519a(a), 416.919a(a). After considering this evidence, the agency "may purchase a consultative examination to try to resolve an inconsistency in the evidence or when the evidence as a whole is insufficient to support a determination or decision on your claim." 20 C.F.R. §§ 404.1519a(b), 416.919a(b); *see also Hawkins*, 113 F.3d at 1166.

"When a claimant contends that the ALJ erred in failing to obtain a consultative examination, [the Court is] presented with the difficult issue of 'deciding what quantum of evidence a claimant must establish of a disabling impairment or combination of impairments before the ALJ will be required to look further.'" *Barrett v. Astrue*, 340 F.

App'x 481, 486 (10th Cir. 2009) (quoting *Hawkins*, 113 F.3d at 1169). "As is usual in the law, the extreme cases are easy to decide . . . [t]he difficult cases are those where there is *some* evidence in the record or *some* allegation by a claimant of a possibly disabling condition, but that evidence, by itself, is less than compelling." *Hawkins*, 113 F.3d at 1167.

Thus, the Tenth Circuit has explained that "the starting place must be the presence of some objective evidence in the record suggesting the existence of a condition which could have a material impact on the disability decision requiring further investigation." *Id.* "Isolated and unsupported comments by the claimant are insufficient, by themselves, to raise the suspicion of the existence of a nonexertional impairment." *Id.* (citation omitted). Rather, "[o]rdinarily, the claimant must in some fashion raise the issue sought to be developed . . . which, on its face, must be substantial." *Id.* (citations omitted). "[T]he claimant has the burden to make sure there is, in the record, evidence sufficient to suggest a reasonable possibility that a severe impairment exists. When the claimant has satisfied his or her burden in that regard, it then, and only then, becomes the responsibility of the ALJ to order a consultative examination if such an examination is necessary or helpful to resolve the issue of impairment." *Id.*

Plaintiff has not met her initial burden as to her claimed "developmental learning impairments." *Doc. 18* at 15. There is an absolute dearth of evidence in the record concerning Plaintiff's cognitive functioning, aside from her own statements and the third-party statement of her daughter. However, "isolated comments about [Plaintiff's] possible limited intelligence, when viewed as part of the entire record, do not sufficiently raise a question about [her] intelligence." *Sneed v. Barnhart*, 88 F. App'x 297, 301 (10th

Cir. 2004); *Hawkins*, 113 F.3d at 1167; *see also Wall v. Astrue*, 561 F.3d 1048, 1063 (10th Cir. 2009) ("in the context of the entire record, Claimant failed to present evidence of a cognitive impairment that was substantial on its face."). As the ALJ notes, Plaintiff has not been diagnosed with a learning disorder, *AR* at 23, and here, as in *Sneed*, no doctor has recommended that she undergo intelligence testing. Moreover, the evidence before the ALJ supports her conclusion that Plaintiff's cognitive functioning did not substantially interfere with her ability to work. *See AR* at 25 (discussing Plaintiff's mental functioning). Finally, the ALJ rightly noted that Plaintiff's "treatment notes show that she has discussed complicated medical issues, such as surveillance versus biopsy of pulmonary nodules, with her physicians with no indication of any limitation of understanding." *AR* at 21; *see AR* at 564, 573.

The same is not true as to Plaintiff's anxiety and depression. The ALJ found Plaintiff's depression to be "at least severe," *AR* at 32, and dozens of entries in Plaintiff's treatment notes make amply clear that she has a history of anxiety and depression which has been treated with outpatient medication. *See AR* at 381, 387, 389-90, 393-94, 397-98, 400-01, 403-04, 406-08, 410-11, 414-15, 417-18, 420-21, 423-24, 429-30, 432-3, 437-8, 440-41, 443-44, 447-48, 450-52, 455-56, 459, 461-62, 464-65, 467-68, 470-71, 474-75, 482, 495-96, 515, 523, 527-28, 533-35, 543-45, 547, 550, 559, 563, 567-68, 647-48, 658-59, 686-87, 699-701, 706-07, 711-12, 730-31, 739-40, 783-84, 787-89, 813, 856. Thus, the question is whether a consultative would have been necessary or helpful to resolve the issue of the degree to which Plaintiff's depression and anxiety affect her functioning. *Hawkins*, 113 F.3d at 1167.

The Commissioner argues that "the record contained sufficient evidence for the ALJ to assess the limitations caused by Plaintiff's depression." *Doc. 20* at 5. Case law supports the notion that when the record contains sufficient evidence to evaluate a claimant's mental impairment, further development of the record is unnecessary. *See Barrett*, 340 F. App'x at 487 (finding no duty to order a consultative psychological examination where "[t]he evidence indicated that claimant's depression was controlled by his medication and resulted in only mild restrictions and difficulties related to his activities of daily living, social functioning, and maintaining concentration, persistence, and pace."); *Cowan v. Astrue*, 552 F.3d 1182, 1187 (10th Cir. 2008) (finding no duty to order a consultative psychological examination "because sufficient information existed for the ALJ to make her disability determination" including, evidence of the claimant's daily activities and a PRT form). The Court agrees with the Commissioner that the ALJ had sufficient evidence to evaluate the limiting effects of Plaintiff's mental impairments in this case.

For one thing, Plaintiff's treatment notes contain little in the form of substantive complaints or treatment related to these diagnoses besides the continuance of outpatient medication. *See, e.g.*, *AR* at 529 (noting that Plaintiff was not tearful, did not have a flat affect and was smiling). There were even some instances where no depression or anxiety was reported or where the same were denied. *AR* at 478, 539 (denying both anxiety and depression), 544 (denying anxiety), 568 (no depression or anxiety), 572 (same), 678 (same), 813 (denying both). And some providers noted that Plaintiff's depression "is well treated" or "controlled" with medication. *AR* at 752, 820. Thus, while the medical evidence establishes that Plaintiff has a long-standing

diagnosis of depression and/or anxiety which has been treated with medication, none of Plaintiff's treating providers appeared to be overly concerned with her mental health. The ALJ summarizes this information when formulating Plaintiff's RFC. *AR* at 31. The ALJ further notes that Plaintiff "did not complain of anxiety or depression until January 2, 2014, a few weeks before her hearing" and "has not sought treatment from a psychiatrist, psychologist, or other mental health professional." *AR* at 31. In light of this scant evidence of any functional limitations from anxiety or depression, it is unsurprising that the ALJ determined that a consultative examination would not be necessary or helpful in determining the severity of Plaintiff's depression and anxiety.

Furthermore, evidence in the record provided the ALJ with ample cause to conclude that Plaintiff's mental impairments do not render her disabled. In addition to Plaintiff's treatment notes the ALJ considered and weighed two medical opinions which evaluated the nature and severity of Plaintiff's mental functioning – one by non-examining state agency consultant, Scott Walker, M.D., and another by Dr. Vigil. *AR* at 32-33.

Dr. Walker reviewed Plaintiff's medical records at reconsideration, on October 11, 2012, and determined that any limitation Plaintiff has as a result of her anxiety or depression is not severe. *AR* at 90, 102. Dr. Walker's noted Plaintiff's history of depression and anxiety as well as a prescription for Zoloft. *AR* at 90, 102. However, he pointed out that Plaintiff "is not currently seen by a mental health provider, no therapy or counseling, no psych admits." *AR* at 90, 102. Dr. Walker further explained that in some of the medical records, Plaintiff denied anxiety or depression at the time of exam and that her family practice records "do not address any mental health concerns." *AR* at 90,

14

102. Dr. Walker completed a Psychiatric Review Technique for Plaintiff and considered

whether Plaintiff's condition could qualify under Listing 12.04 (Affective Disorders). *AR*

at 90, 102. He concluded that it did not because, in his opinion, Plaintiff demonstrated

no restrictions of her activities of daily living and only mild difficulties in maintaining

social functioning and in maintaining concentration, persistence, and pace. *AR* at 90,

102. Dr. Walker also noted that Plaintiff suffered no episodes of decompensation. *AR* at

90, 102. Ultimately Dr. Walker concluded that

> [w]hile clmt does appear to have some depression over her physical
> impairments and possibly some bereavement, current medical evidence
> does not support a severe limitation. The clmt is not participating in any
> psych TX other than RX use. Her ADLs appear to be only limited by her
> physical pain, not by psych issues.

*AR* at 90, 102. The ALJ gave Dr. Walker's opinion limited weight, stating "[w]hile I am

influenced by the rationale of the state agency consultants, I find that the claimant's

depression is at least severe." *AR* at 32.

As noted above, Plaintiff was examined by Dr. Vigil on December 20, 2013. *See*

*AR* at 759. Among her primary disabling complaints, Plaintiff reported "severe

depression and anxiety." *AR* at 759. During the examination Plaintiff told Dr. Vigil that

she could not continue her work as a laundry attendant in part due to her "depression

and anxiety issues." *AR* at 761. Dr. Vigil noted that Plaintiff's affect and mood were

normal although she did appear "moderately anxious." *AR* at 761.

Dr. Vigil found Plaintiff to be moderately limited in her abilities to remember

locations and work-like procedures, to maintain attention and concentration for

extended periods of time, to perform activities within a schedule, maintain regular

attendance and be punctual within customary tolerance, to sustain an ordinary routine

without special supervision, to interact appropriately with the general public, to accept instructions and respond appropriately to criticism from supervisors, to maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness, to respond appropriately to changes in the workplace, to travel in unfamiliar places or use public transportation, and to set realistic goals or make plans independently of others. *AR* at 766-67. Dr. Vigil further found Plaintiff to be markedly limited in her abilities to understand and remember detailed instructions, carry out detailed instructions, to work in coordination with/or in proximity to others without being distracted by them, and to complete a normal workday and workweek without interruption from psychological based symptoms and to perform at a consistent pace without unreasonable number and length of rest periods. *AR* at 766.

Overall, Dr. Vigil concluded that Plaintiff's physical and psychological conditions combined precluded even sedentary work, *AR* at 763, and that Plaintiff's conditions met Listing 12.04. *AR* at 768. As explained above, however, the ALJ "accord[ed] little weight to Dr. Vigil's opinion regarding as to the nature and severity of the claimant's impairments and resulting limitations." *AR* at 33.

Drs. Walker and Vigil's findings provided the ALJ with sufficient evidence concerning Plaintiff's mental health diagnoses to make a decision in this case. *See Barrett*, 340 F. App'x at 487; *Cowan*, 552 F.3d at 1187. The doctors' opinions examined the severity of Plaintiff's mental impairments and provided overviews of how each thought Plaintiff could perform in the work setting. *Compare AR* at 89-90 *with AR* at 756-70. It was the ALJ's prerogative to weigh these opinions and to reach conclusions about the severity of Plaintiff's mental impairments. This is exactly what the ALJ did by

affording little weight to the opinions of Dr. Walker and Dr. Vigil, and by reaching the conclusion that while Plaintiff's depression is at least severe, it is not disabling. Therefore, the ALJ did not err in refusing to develop the record as to Plaintiff's anxiety and/or depression "because sufficient information existed for the ALJ to make her disability determination." *Cowan*, 552 F.3d at 1187.

Plaintiff argues that by effectively rejecting Dr. Vigil's opinion, the ALJ was left without sufficient evidence by which to evaluate her RFC. *Doc. 23* at 6. In other words, Plaintiff argues that Dr. Walker's opinion cannot form the basis of her mental RFC. *Id.* ("The fact that a stale, non-examining consultant's assessment remained does not change the fact that the record contained insufficient evidence for the ALJ to determine Ms. Anchondo's mental RFC.") (citing *Fleetwood v. Barnhart*, 211 F. App'x 736, 739-40 (10th Cir. 2007) (unpublished)). The Court is not persuaded. In *Fleetwood*, the Tenth Circuit held that check-the-box forms filled out by agency physicians "standing alone, unaccompanied by thorough written reports or persuasive testimony are not substantial evidence." *Id.* at 740 (quoting *Frey v. Bowen*, 816 F.2d 508, 515 (10th Cir. 1987)). Dr. Walker's opinion in this case does not run afoul of this rule. As detailed above, Dr. Walker's conclusions as to Plaintiff's abilities are supported by a written explanation. Thus, *Fleetwood* is inapplicable in this case.

To summarize, there is insufficient evidence in the record to trigger the ALJ's duty to order a consultative examination to assess Plaintiff's learning impairments. While there is evidence in the record that she suffered from anxiety and depression, there was sufficient evidence for the ALJ to assess the degree of limitation these

impairments caused. Therefore, the ALJ acted within her discretion by refusing to order a consultative psychological evaluation in this case.

### C. Plaintiff's Urinary Frequency and her RFC

Next, Plaintiff challenges the ALJ's treatment of her urinary incontinence when formulating her RFC. Specifically, Plaintiff argues that "[n]othing contained in the RFC describes for or accounts for the effects of Ms. Anchondo's heavily documented, severe urinary incontinence." *Doc. 18* at 19 (emphasis omitted).

The regulations require an ALJ to consider "limitations and restrictions imposed by all of an individual's impairments" when formulating a claimant's RFC. SSR 96-8P at *5, 1996 WL 374184; *see also* 20 C.F.R. §§ 404.1545, 416.945. The ALJ did so in this case. First, the Court notes that the ALJ stated that she "considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence" when formulating Plaintiff's RFC. *AR* at 26. The Court starts with the proposition that it should take the ALJ at her word when she declares that she has considered this matter. *See Hackett v. Barnhart*, 395 F.3d 1168, 1173 (10th Cir.2005) ("[O]ur general practice ... is to take a lower tribunal at its word when it declares that it has considered a matter.").

However, the Court does not merely have to take the ALJ at her word in this case, as the ALJ then went on to specifically discuss Plaintiff's urinary incontinence when formulating her RFC:

> With regard to the claimant's bladder and urinary related symptoms, treatment notes show that the claimant was prescribed Ditropan for overactive bladder in July 2011 (Ex. 3F/111-112). Due to ongoing complaints of stress and urinary incontinence, the claimant underwent urodynamic testing on October 1, 2013, which showed mixed incontinence (stress and urge) (Ex. 20F/32). Her gynecologist prescribed a pessary for

stress incontinence and oxybutynin for urge (Ex. 20F/29-30). I note that on the Disability Report filed with her application in 2011, the claimant listed oxybutynin for overactive bladder when stating her medications, but did not mention overactive bladder as [a] work limitation (Ex. 2E). On a form completed in November 2012, she indicated that she woke up twice a night to go to the bathroom (Ex. 13F/61). It was not until a few months before her disability hearing that she began complaining of a dramatic increase in her symptoms (Ex. 20F/26 and 34). She testified at the hearing that she needed to urinate every 3 to 5 minutes, even though her attorney pointed out that the hearing had been proceeding for at least 20 minutes at that point. **Overall, I am persuaded that any urinary symptoms experienced by the claimant would not prevent work within the foregoing residual functional capacity, with the ameliorating measures recommended by her gynecologist.**

*AR* at 30 (emphasis added).

Notwithstanding this discussion, Plaintiff argues that "the objective medical evidence of record supported some degree of environmental restriction related to urinary frequency and incontinence," especially considering the ALJ found urinary incontinence to be one of Plaintiff's severe impairments at Step Two. *Doc. 18* at 20. However, it is the ALJ's prerogative to assess the degree to which an impairment will restrict a claimant's RFC. In this case, after reviewing the available evidence, the ALJ concluded that Plaintiff's urinary incontinence, though severe, would not impose additional restrictions that are inconsistent with her RFC. Having considered the evidence of record concerning Plaintiff's urinary incontinence, the Court will not disturb this finding. *See Villalobos v. Colvin*, 544 F. App'x 793, 797 (10th Cir. 2013) (unpublished) ("The administrative law judge had no evidence of functional limitations from the alleged incontinence. . . . As a result, the administrative law judge did not err by assessing the residual functional capacity without incorporating limitations from incontinence.").

### D. Evaluation of Obesity

Plaintiff argues that the ALJ failed to incorporate the functionally limiting effects of obesity into in her RFC, contrary to SSR 96-8p, SSR 02-01p and Listing 1.00Q. *Doc. 18* at 20. The Commissioner counters that the ALJ indeed considered obesity when formulating Plaintiff's RFC. *Doc. 20* at 12 (citing *AR* at 26, 29-30).

"Obesity is a risk factor that increases an individual's chances of developing impairments in most body systems. It commonly leads to, and often complicates, chronic diseases of the cardiovascular, respiratory, and musculoskeletal body systems." SSR 02-01p, 2002 WL 34686281, at *3. For this reason, "Social Security Ruling (SSR) 02-1p requires an ALJ to consider the effects of obesity when assessing RFC, including the fact that 'the combined effects of obesity with other impairments can be greater than the effects of each of the impairments considered separately.'" *DeWitt v. Astrue*, 381 F. App'x 782, 785 (10th Cir. 2010) (quoting SSR 02-1p at *1). However, "an ALJ may 'not make assumptions about the severity or functional effects of obesity combined with other impairments' but rather, must 'evaluate each case based on the information in the case record.'" *Id.*

Plaintiff relies upon *DeWitt*, arguing that in this case the ALJ "made assumptions about the effects of obesity and failed to include in the RFC any restrictions clearly traceable to those effects." *Doc. 18* at 22. In *DeWitt*, the ALJ, as here, found obesity to be a severe impairment at Step Two. *Id.* at 784. Although the *Dewitt* ALJ, again as here, ultimately limited the claimant to sedentary work with additional restrictions, the Tenth Circuit reasoned:

> there [was] nothing in the [ALJ's] decision indicating how or whether [the claimant's] obesity influenced the ALJ in setting those restrictions. Rather,

it appear[ed] that the ALJ's RFC assessment was based on "assumptions about the severity or functional effects of [DeWitt's] obesity combined with [her] other impairments" – a process forbidden by SSR 02-1p.

*Id.* at 785. Accordingly, the Tenth Circuit remanded for proper consideration of the claimant's obesity in relation to her other impairments and her RFC. *Id.*

Unfortunately for Plaintiff, *Dewitt* is distinguishable from this case. There, the ALJ gave "considerable weight" to a physician's testimony (Dr. Brahms) when formulating the claimant's RFC. *Id.* at 785. "But in doing so, the ALJ mistakenly believed that Dr. Brahms had identified obesity as one of DeWitt's medical conditions. In fact, Dr. Brahms offered no opinion about the functional effects of DeWitt's obesity . . . [h]e simply never mentioned obesity." *Id.* Thus, the Tenth Circuit concluded that the ALJ could not rely on Dr. Brahms' testimony to "satisfy the duty to consider the effects of DeWitt's obesity on her other severe impairments." *Id.*

In this case, however, the ALJ did not rely on a single medical opinion in determining the limiting effects of Plaintiff's obesity. Rather, she reviewed the entire record and "considered the effects of claimant's obesity in combination with her other impairments, as required by SSR 02-1p." *AR* at 24. The ALJ further considered the effects of Plaintiff's obesity on her musculoskeletal, respiratory and cardiovascular systems. *AR* at 24. The ALJ summarized her findings as follows:

The claimant is obese, at a height of 62 to 63 inches and weight of 213 pounds in July 2011 and 220 pounds in December 2013, with her body mass index calculated at 38.4 in August 2011 and 35 in April 2013 (Ex. 3F/133 and 152, Ex. 13F/6, and Ex. 14F/6). She has obesity related diagnoses of hypertension, joint pain, and obstructive sleep apnea. The claimant was hospitalized from June 2, 2011 to June 4, 2011, for workup and evaluation of chest pain, but cardiac catheterization was negative, and her chest pain was determined to be noncardiac in origin (Ex. 3F/3-5). Her medical providers have repeatedly recommended that she follow a

diet and exercise regularly to reduce her weight and improve her overall health.

*AR* at 24. The ALJ then discussed Plaintiff's obesity-related diagnoses when formulating her RFC. *See AR* at 27-31.

Yet when formulating her RFC, the ALJ never explicitly discusses any additional limiting effects caused by Plaintiff's obesity. *See AR* at 27-31. Plaintiff contends that this is reversible error, arguing that "nothing in the RFC is apparently traceable to the additional limiting effects of Ms. Anchondo's obesity[.]" *Doc. 18* at 23. However, Plaintiff does not identify any further limitations her obesity causes. Post-*DeWitt* case law shows this to be fatal to Plaintiff's claim of error.

In *Arles v. Astrue*, 438 F. App'x 735, 740 (10th Cir. 2011) (unpublished), the claimant argued that the ALJ "failed to include his obesity in the RFC determination." *Id.* While the Tenth Circuit found that "[t]he ALJ could have provided a more particularized discussion of the effects of Mr. Arles's obesity," it ultimately deferred to the ALJ's assertion that the claimant's obesity had been evaluated under the criteria set forth in SSR 02-1p. *Id.* In addition to the deference it afforded to the ALJ, the Tenth Circuit placed the burden on the claimant to show how his obesity further restricted his RFC. *Id.* ("Moreover, Mr. Arles does not discuss or cite to any evidence showing that obesity further limited his ability to perform a restricted range of sedentary work.").

Next, in *Jimison ex rel. Sims v. Colvin*, 513 F. App'x 789, 798 (10th Cir. 2013) (unpublished), the claimant "claim[ed] error by the ALJ in finding Ms. Sim's obesity to be a severe impairment at step two but not including it in his RFC at step five." *Id.* The Tenth Circuit rejected this argument because "there [was] no record indication of any

functional limitations from Ms. Sim's obesity or of any impairments possibly caused or exacerbated by her obesity that are inconsistent with the RFC" the ALJ assigned. *Id.*

Then, in *Smith v. Colvin*, 625 F. App'x 896, 899 (10th Cir. 2015) (unpublished), the claimant argued, as claimant does here, that "other than noting her obesity was a severe impairment, the ALJ never analyzed or discussed her obesity, including in his RFC analysis." *Id.* The Tenth Circuit disagreed. Emphasizing that an ALJ cannot assume a functional deficit, the court addressed the claimant's argument thusly:

> We take this to mean that for each piece of evidence the ALJ discussed in formulating her RFC (and there were several), he was also required to note the absence of any evidence that her obesity resulted in additional functional limitations or exacerbated any other impairment. We decline to impose such a requirement on the ALJ.

*Id.* The Tenth Circuit then again placed the burden on the claimant to show that her obesity resulted in further limitations than the ALJ assigned in her RFC: "Ms. Smith has not shown that her obesity alone, or in combination with other impairments, resulted in any further limitations." *Id.*

Finally, in *Rose v. Colvin*, 634 F. App'x 632 (10th Cir. 2015) (unpublished), the claimant argued, as claimant does here, that "although the ALJ found her obesity to be a severe impairment, he failed to properly consider its effects in formulating her RFC." *Id.* at 637. The Tenth Circuit acknowledged that "[t]he ALJ did not specifically mention obesity in the RFC determination," but, instead, "included specific limitations and restrictions for stooping, kneeling, and crouching." *Id.* The court then placed the onus on the claimant to show how the medical evidence supported further functional limitations. *Id.* Observing that the claimant cited no such evidence, the Court held that "the factual record does not support Ms. Rose's position that her obesity, either alone or in

combination with other conditions, precludes her from performing a limited range of sedentary work." *Id.* (quoting *Howard v. Barnhart*, 379 F.3d 945, 948 (10th Cir. 2004)).

In sum, recent case law mandates that a failure to properly consider obesity is not reversible error where, as here, the claimant points to no evidence that obesity imposes any additional limitations beyond those the ALJ found. In the absence of any such evidence, and having carefully reviewed the record in this case, the Court is confident that the ALJ adequately considered Plaintiff's obesity when formulating her RFC.

### E. The ALJ's Step Five Analysis

Plaintiff's final argument takes issue with the ALJ's finding that she acquired transferrable skills working as a cashier/checker. *See Doc. 18* at 23-27. As the Commissioner correctly notes, "[i]n this case, the ALJ found Plaintiff turned 55 (advanced age) by the time the decision was issued, had a limited education, and could perform a range of sedentary work." *Doc. 20* at 13 (citing *AR* at 34). The regulations speak specifically to such a situation:

> If you are of advanced age (age 55 or older), and you have a severe impairment(s) that limits you to sedentary or light work, we will find that you cannot make an adjustment to other work **unless you have skills that you can transfer to other skilled or semiskilled work**. . .

20 C.F.R. § 404.1568(d)(4), 416.968(d)(4) (emphasis added); *see also* SSR 82-41, 1982 WL 31389 at *5 ("To find that an individual who is age 55 or over and is limited to sedentary work exertion has skills transferable to sedentary occupations, there must be very little, if any, vocational adjustment required in terms of tools, work processes, work settings or the industry."). Thus, by restricting Plaintiff's RFC to a limited range of sedentary work, the ALJ was compelled to identify transferrable skills in Plaintiff's work

history in order to find her not disabled. *See Dikeman v. Halter*, 245 F.3d 1182, 1184 (10th Cir. 2001).

Relying on Vocational Expert testimony, the ALJ found that Plaintiff acquired work skills from her past relevant work as a grocery store cashier/checker, D.O.T. No. 211.462-014. *AR* at 34. The Vocational Expert testified that Plaintiff acquired the following skills working in this position: "operating a cash register; recording prices; collecting cash, check or charge payments from customer; making change; recording daily transactions; balancing cash drawer; [and,] providing assistance to customers." *AR* at 75.

Plaintiff argues that she could not have acquired transferrable skills as a cashier/checker because that position was not "past relevant work," *Doc. 18* at 23, and because she "failed to demonstrate proficiency in cashier/checker related tasks." *Id.* at 25. Plaintiff's arguments miss the mark for several reasons.

Most importantly, Plaintiff's arguments focus upon the wrong job – her employment with Family Dollar. There Plaintiff worked as an "assistant manager" from July 2003 through March 2004, a period of eight months. *AR* at 226, 239,[5] 192-93 (showing earnings from Family Dollar in 2003-2004). But the Vocational Expert testified that that because Plaintiff's job duties were limited in this role, the position more closely resembled that of a cashier checker, D.O.T. No. 211.462-010. *AR* at 73. It is this job on which Plaintiff's arguments hinge. *Doc. 18* at 25. However, Plaintiff later worked as a cashier checker at a grocery store. *AR* at 70, 192-93 (showing earnings from Hi-Lo Market from 2004-2007). It was *this* job from which the ALJ determined that Plaintiff had

---

[5] Plaintiff would later testify that she worked at this job for ten months to a year, but her listing of her past relevant work shows that she only worked there for eight months. *Compare AR* at 70 *with AR* at 226, 239.

acquired transferrable skills. *AR* at 34. The two positions are distinct both as a matter of

their D.O.T. numbers, *AR* at 71-73; *compare* D.O.T. No. 211.462-010 (convenience

store cashier) *with* D.O.T. No. 211.462-014 (grocery store cashier), and in relation to the

length of Plaintiff's employment and earnings received therefrom. *See AR* at 192-93.

Plaintiff further argues in her Reply brief that in connection with her job at the

Family Dollar, the ALJ "did ***not*** demonstrate that Plaintiff's past work as a

Cashier/Checker was substantial gainful activity." *Doc. 23* at 9. "Past relevant work is

work that you have done within the past 15 years, that was substantial gainful activity,

and that lasted long enough for you to learn to do it." 20 C.F.R. §§ 404.1560(b)(1),

416.960(b)(1). Substantial gainful activity is defined as work activity that involves doing

significant physical or mental activities for pay or profit, whether or not a profit is

realized. 20 C.F.R. §§ 404.1572(a)-(b), 416.972(a)-(b). The amount of money earned

doing a particular job is a primary consideration in determining whether a person is

engaged in substantial gainful activity. 20 C.F.R. §§ 404.1574(a)(1), 416.974(a)(1). The

POMS[6] establish that minimum monthly earnings in 2003-2004 to be considered

substantial gainful activity ranged from $800.00 in 2003 to $810.00 in 2004. *See* POMS

DI 10501.015 *available at* https://secure.ssa.gov/poms.nsf/lnx/ 0410501015.

In connection with her employment with Family Dollar, Plaintiff made $2,175.40

in 2003 and $7,365.20 in 2004, for total earnings of $9,540.60. *AR* at 192-93. Dividing

this number by the eight months she worked results in total average monthly earnings of

---

[6] "The POMS is 'a set of policies issued by the Administration to be used in processing claims. . . .' We 'defer to the POMS provisions unless we determine they are 'arbitrary, capricious, or contrary to law[.]'" *Carver v. Colvin*, 600 F. App'x 616, 619 (10th Cir. 2015) (quoting *McNamar v. Apfel*, 172 F.3d 764, 766 (10th Cir. 1999); *Ramey v. Reinertson,* 268 F.3d 955, 964 n. 2 (10th Cir. 2001)).

$1,192.57, well above the substantial gainful activity amounts established by the POMS. In other words, Plaintiff's work as a cashier/checker at Family Dollar was substantially gainful. Plaintiff has not argued that her work as a cashier checker at the grocery store from 2004-2007 did not qualify as substantial gainful activity.

Plaintiff next maintains that "she did not actually learn any skills as a cashier," *Doc. 23* at 10, pointing out that she was terminated from Family Dollar. *Doc. 18* at 25-26. Plaintiff has pointed to no authority establishing the relevance of her termination from a job she maintained for eight months. However, assuming for the sake of argument that Plaintiff's position has merit, she fails to explain how she could not have gained these skills while working for three years as a grocery store cashier at the Hi-Lo Market.

Perhaps conceding that her initial arguments do not apply to the grocery store cashier position, Plaintiff shifts her focus in her reply brief, arguing that "it was improper [for the ALJ] to transfer unskilled job activities from any level of work." *Doc. 23* at 10 (citing SSR 82-41). In other words, Plaintiff argues that "the job-related tasks of the 'grocery cashier' (semi-skilled work with SVP of 3) did not constitute transferrable skills." *Id.* The Court disagrees.

"Skills refer to experience and demonstrated proficiency with work activities in particular tasks or jobs." SSR 82-41, 1982 WL 31389 at *3.

> A skill is knowledge of a work activity which requires the exercise of significant judgment that goes beyond the carrying out of simple job duties and is acquired through performance of an occupation which is above the unskilled level (requires more than 30 days to learn). It is practical and familiar knowledge of the principles and processes of an art, science or trade, combined with the ability to apply them in practice in a proper and approved manner.

SSR 82-41, 1982 WL 31389 at *2. "If you have acquired skills through your past work, we consider you to have these work skills unless you cannot use them in other skilled or semi-skilled work that you can now do." 20 C.F.R. §§ 404.1565(a), 416.965(a). "Skills, levels of skills and potential occupations to which skills from PRW may be transferred are for the adjudicator or ALJ to determine (with the assistance, when required, of a VS or occupational reference sources)." SSR 82-41, 1982 WL 31389 at *4. "When an ALJ makes a finding that a claimant has transferrable skills, he must identify the specific skills actually acquired by the claimant and the specific occupations to which those skills are transferrable." *Dikeman*, 245 F.3d at 1185.

Plaintiff correctly notes that when determining whether skills may be transferred from semi-skilled occupations, "close attention must be paid to the actual complexities of the job in dealing with data, people or objects and to the judgments required to do the work" because "the content of work activities in some semiskilled jobs may be little more than unskilled." SSR 82-41, 1982 WL 31389 at *2. However, Plaintiff does not cite to any authority establishing that the work activities identified by the ALJ in this case are unskilled and therefore not transferrable. To the contrary, the ALJ appears to have complied with the applicable regulations and precedent by relying on Vocational Expert testimony establishing that Plaintiff has transferrable skills from her work as a grocery store cashier. *See Jensen v. Barnhart*, 436 F.3d 1163 (10th Cir. 2005). Accordingly, the Court will not disrupt this finding.

## IV.    Conclusion

Plaintiff has failed to demonstrate that the ALJ committed reversible error in this case.

Wherefore,

**IT IS HEREBY ORDERED** that Plaintiff's motion to remand (*Doc. 18*) is **denied**

and a final order pursuant to Rule 58 dismissing this case will be entered.


_____
UNITED STATES CHIEF MAGISTRATE JUDGE
Presiding by Consent